IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

**FILED**

October 18, 2005

**CLERK, U.S. DISTRICT COURT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| v. | § | No. 7:05-CR-005-R (1) |
| | § | |
| | § | |
| DONALD STEVEN LOONEY | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is defendant, Donald Steven Looney's motion to suppress, filed June 3, 2005, and the government's opposition to the motion, filed June 14, 2005. The Court held a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), on September 28, 2005. After reviewing the briefs submitted by counsel, examining the applicable law, observing the demeanor of the warrant affiant at the hearing, and judging his credibility in light of the evidence presented, the Court **DENIES** defendant's motion to suppress.

### I. BACKGROUND

In January 2004, authorities from the Bureau of Indian Affairs ("BIA") and state police began investigating drug trafficking at the Comanche Nation's Red River Casino in Oklahoma. As part of that investigation, Agent Gary Cunningham, an undercover agent of the BIA, purchased a small amount of methamphetamine (0.1 grams) from a woman named La Donna Harris on January 29 at the casino. Agent Cunningham then returned to the casino days later and purchased more methamphetamine (1.5 grams) from Harris. Defendant's wife, Mary Beth Looney, accompanied Harris during this transaction. Months later, on June 13, Agent Cunningham returned to the casino and purchased 5.7 grams of methamphetamine from Harris. At this time, Harris told Agent

1

Cunningham that Mary Beth Looney was her supplier.

On August 16, 2004, Agent Cunningham began negotiating with Harris to buy a full ounce of methamphetamine, a far larger amount than he had previously purchased. The next day, Harris informed Agent Cunningham that she was concerned about security at the casino and wanted the transaction to occur in Wichita Falls, Texas. The two agreed to meet in Wichita Falls on August 24 for the sale. Agent Cunningham then contacted Officer Bobby Dilbeck of the Wichita Falls Police Department to inform him of the investigation and to request his assistance in conducting a "buy bust."

On the afternoon of August 24, Agent Cunningham met with Harris and her ex-husband Ernest Green at a Carl's Jr. parking lot in Wichita Falls.[1] *See* Gov.'t Ex. 4 (map of area). Officer Dilbeck and other WFPD officers observed the meeting from unmarked vehicles parked nearby. Unbeknownst to Harris and Green, Agent Cunningham hid a microphone and a wire tap device inside his vehicle, which permitted Officer Dilbeck to hear and record the entire encounter. Portions of the recorded conversations were played in chambers during Defendant's September 28 hearing. Those recordings and Officer Dilbeck's testimony serve as the basis for the remainder of this factual account. *See* Gov.'t Ex. 1, 2 (audio recording and accompanying transcript).

Harris told Agent Cunningham that she did not have the drugs as promised since Mary Beth Looney did not want to relinquish the drugs until she was assured of payment. Harris then proposed that they all go to the Looney residence to arrange the sale.[2] Agent Cunningham told Harris that he

---

[1] The parking lot is less than two miles from the Looney residence.

[2] At one point, Harris proposes that Agent Cunningham park near the Looney residence so that they can arrange the following transaction: Cunningham would give Harris half of the purchase price for the drugs, which she would then take to Mary Beth Looney inside her home in exchange for the drugs. Harris would then walk back to Agent Cunningham's car and give him the drugs once he paid the remaining amount owed.

did not want to go to the Looney residence and insisted on staying at the parking lot.  She then used Agent Cunningham's cellular telephone to call 940-[xxx-xxxx] – the published telephone number for the Looney residence – to tell Ms. Looney about the problem.  She spoke with Defendant about the problem and was told to wait for Mary Beth Looney to bring the drugs.  As they waited for Ms. Looney to arrive, Harris expressed concern that the transaction was not occurring as planned and blamed Mary Beth Looney for the situation.

Mrs. Looney never came.  As a result, Harris became frustrated by the unanticipated delay (as evidenced by her four- and five-letter words describing the situation and the long-overdue Ms. Looney).  She then directed Ernest Green to drive to the Looney residence, located at 4319 Greenridge Ave., to locate Ms. Looney.  Green then left Harris alone with Agent Cunningham and departed in the direction of the Looney residence.[3]  The two WFPD officers dispatched to monitor the Looney residence saw Ernest Green arrive, enter the residence, and depart shortly thereafter in the direction of the parking lot.[4]

While waiting for Green to return, Harris told Agent Cunningham that the Looneys were her supplier and that their residence was the source of the methamphetamine.  She also told him about her extensive experience in drug sales, her preferred strategy in arranging drug transactions so as to minimize detection by the police, and her reasons for disapproving of Ms. Looney's complicated directives for the sale.  After a few minutes had lapsed, she once again phoned the residence.  This time, she spoke with Mary Beth Looney who told her that Green would be returning with the

---

[3]Officer Dilbeck testified about the shortest route between the parking lot and the Looney residence and also estimated the travel time between those two locations.

[4]Officer Dilbeck later testified on cross examination at the Sept. 28 hearing that Green was not under constant surveillance during his trip.

3

merchandise.  When Green returned,[5] he entered Agent Cunningham's vehicle and showed him the

drugs.  Officers then descended on Green and Harris and arrested them for delivering a controlled

substance.

Shortly thereafter, Officer Dilbeck prepared an affidavit for a search warrant for drugs,

paraphernalia, and weapons at the Looney residence.  In that affidavit, he recited Harris's admissions

implicating the Looneys as the source of the drugs; the three undercover drug purchases at the casino

(one of which was in the presence of Mary Beth Looney); the arranged meeting on August 24,

including Harris's statement to Agent Cunningham that Mary Beth Looney feared sending the drugs

without being paid first; and the telephone call from Harris to Mary Beth Looney who informed

Harris that she was sending the drugs with Green.  In addition, the warrant affidavit also stated that

"WFPD officers saw Ernest Green enter the Looney residence and drive directly to the... parking

lot."  Gov't Ex. 3 (warrant affidavit).  Accordingly, Officer Dilbeck concluded from these facts and

the "recored [*sic*] conversation" that methamphetamine delivered by Green "came from" the Looney

residence and that more methamphetamine could be found there.  *Id.*

A state magistrate reviewed the affidavit and authorized the search.  The officers executing

the warrant discovered more than 200 grams of methamphetamine, assorted paraphernalia, and four

weapons, including an assault rifle.  The Bureau of Alcohol, Tobacco, and Firearms accepted the

case for federal prosecution, and Defendant was indicted by a federal grand jury for possessing with

intent to distribute more than 50 grams of methamphetamine (21 U.S.C. §841(a)(1)) and for

possessing firearms in furtherance of a drug trafficking crime (21 U.S.C. §924(c)).

---

[5]The AUSA present at the Sept. 28 hearing presented, without interruption, the entire audio recording from the time of Green's departure to the time of his return.  The time between these two events was estimated to be approximately ten to fifteen minutes, which Officer Dilbeck testified would have been consistent a trip to the Green residence from the parking lot.

## II. ANALYSIS

Defendant has moved to suppress the evidence found at his home, claiming that the search warrant was based, "in whole or in part," on false or misleading evidence, without which there would not have been sufficient probable cause for the warrant to issue. Def.'s Mot. at 2. Specifically, Defendant challenges the sentence in the warrant affidavit which states, "WFPD officers saw Ernest Green enter the Looney residence and drive directly to the... parking lot." *See* Gov.'t Ex. 3 (warrant affidavit). In support of his motion, Defendant successfully requested an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), which was held on Wednesday, September 28, 2005.[6]

### A.     Defendant's Burden of Proof under *Franks v. Delaware*

In *Franks v. Delaware*, the Supreme Court stated that a defendant who makes a "substantial preliminary showing" that a false statement was included in an application for a warrant may introduce or develop additional evidence at an evidentiary hearing to prove that some of the allegations on which the search warrant rests were false and were deliberately or recklessly included in the warrant affidavit. *See Franks*, 438 U.S. at 171. To prevail at a *Franks* hearing, a defendant must prove by a preponderance of the evidence that (1) the challenged statements were false and (2) their inclusion in the affidavit amounted to, at the very least, reckless disregard for the truth on the part of the affiant or other officers. *See id*. If the defendant meets his or her burden of proof, then the tainted language will be excised from the affidavit and the court will then determine whether the

---

[6]To obtain a "Franks hearing," the defendant must make a "substantial preliminary showing" that a particular portion of the warrant affidavit is false. *See Franks*, 438 at 171. This is usually accomplished by an "offer of proof" through affidavits or otherwise. *Id.* When the defendant is unable to produce such evidence, he or she should explain the absence of such evidence to the satisfaction of the court.

remaining portion of the affidavit would have established probable cause for the warrant to issue. *Id.*

The Court in *Franks* emphasized that any deliberate falsity or reckless disregard for the truth must occur on the part "of the affiant [and] not any governmental informant." *See Franks*, 438 U.S. at 171. This distinction is best understood from the perspective of the exclusionary rule. Since the exclusionary rule is designed to deter police misconduct, only the veracity of the police themselves is at issue in a *Franks* hearing. Therefore, if a private informant provides an officer with deliberately false information and the officer uses that information to procure a search warrant, the only relevant issue at a *Franks* hearing would be whether the officer reasonably believed that the information obtained from the informant was reliable. This is because the Fourth Amendment only requires the government to show good reason for believing the existence of facts necessary for probable cause; it does not require that officers have absolute certainty of every fact they recite. As the Supreme Court stated in *Franks*, "[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." *Id.*, at 164-65 (emphasis in original)(citation omitted). "This does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct... But surely it is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id.*, at 165.

Yet, a special situation arises in cases like this one, where the information recited by the officer-affiant is obtained from other police officers. The Court in *Franks* contemplated this situation and warned that "police [cannot] insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity." *Id.*, at 163 n.6. For that

reason, various courts of appeal, including the Fifth Circuit, have held that defendants may be entitled to suppression based on the misstatements or omissions of an officer-informant who is not the actual affiant, if the officer acted deliberately or with reckless disregard for the truth. *See Hart v. O'Brien*, 127 F.3d 424, 448 (5th Cir. 1997) (citing *United States v. Wapnick*, 60 F.3d 948, 956 (2d Cir. 1995); *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992)).

If the Defendant fails to meet his burden of proof under *Franks*, the court may apply the "good-faith" exception to the exclusionary rule[7] and consider whether the entire warrant affidavit establishes probable cause to search. *See United States v. Cavazos*, 288 F.3d 706, 710 (5th Cir. 2002) ("After several hearings... the district court found no evidence to suggest that the officers had deliberately or recklessly provided the false information.   Having made these findings, the good-faith exception would have allowed the court to consider the entire affidavit, and the analysis should have ended there.").   By contrast, if the defendant meets his burden of proof under *Franks*, then the court must then excise the tainted language from the affidavit and determine whether the remaining portion would have established the necessary probable cause for the warrant to issue. *Cavazos*, 288 F.3d at 710 (citing *Franks*, 438 U.S. at 156-57 and *United States v. Alvarez*, 127 F.3d 372, 374 (5th Cir. 1997)); *see also*, *United States v. Dickey*, 102 F.3d 157, 161 (5th Cir. 1996).   This is because the good-faith exception to the exclusionary rule cannot apply when an officer does not act in "good faith." *Cavazos*, 288 F.3d at 709-10 (citing *Franks*, 438 U.S. at 155-56).

### B.      Defendant Fails to Meet his Burden of Proof

Defendant argues that the search warrant at issue in this case "was obtained... in whole or

---

[7] The good-faith exception to the exclusionary rule provides that where probable cause for a search warrant is based on incorrect information, but the officer's reliance upon the truth of that information was objectively reasonable, then the evidence obtained from the search will not be excluded. *See United States v. Leon*, 468 U.S. 897, 919-20 (1984).

in part with false or misleading information." Def.'s Mot. at 2.  Specifically, Defendant challenges

Officer Dilbeck's claim that WFPD officers saw Ernest Green enter Defendant's residence and

"drive directly" to the parking lot where Harris and Agent Cunningham were waiting.  *See* Govt.'s

Ex. 3 at 3.  Defendant argues that without these statements there would not have been probable cause

to search and, therefore, the warrant would not have issued.  *See* Def.'s Mot. at 2.

The Government responds to these allegations by arguing that the affidavit did not contain

any misstatement or, alternatively, that "any misstatement" about Green's travels between the Carl's

Jr. parking lot and the Looney residence was not deliberate since those statements were a

"reasonable inference" from the circumstances of the investigation.  *See* Govt's Resp. at 7 n.4 (citing

*United States v. Collins*, 972 F.2d 1385, 1411 (5th Cir. 1992)).  Lastly, the government argues that

even if the Defendant could prove that Officer Dilbeck or another officer deliberately or recklessly

made a false statement, "any error or omission concerning the movements of Green during his

travels to and from the [Defendant's] residence does not undercut a finding of probable cause" since

the other recitals in the affidavit would be sufficient for probable cause to search the Defendant's

residence.  *See* Govt's Resp. at 7.

As shown below, the Court finds that Defendant fails to meet his burden of proof.  Although

the Defendant shows by a preponderance of the evidence that the statement was "false or

misleading," Defendant fails to prove that Officer Dilbeck acted deliberately or with reckless

disregard for the truth when he included that statement in the affidavit.

### 1.    False Statement

Defendant alleges that the following statement is false or misleading: "WFPD officers saw

Ernest Green enter the Looney residence and drive directly to the... parking lot."  Gov.'t Ex. 3

(warrant affidavit).  This phrase contains two factual allegations: the first is that WFPD officers saw Green "enter" the Looney residence and the second is that they saw him "drive directly" to the parking lot.  With respect to the first factual allegation, the Court heard testimony from Officer Dilbeck that there were two undercover officers positioned outside the Looney residence who saw Ernest Green enter the residence.  Although Defendant attempted to disprove this allegation on cross examination, the Court finds defendant has failed to show by a preponderance of the evidence that officers did not see Green enter the Looney residence.

More problematic, though, is the allegation that officers saw Green "drive directly" to the parking lot.  The adverb "directly" means "in a direct manner" or "without delay."[8]  Therefore, use of the phrase "drive directly" in the affidavit implies to the judge evaluating the affidavit that officers observed Ernest Green drive to the parking lot from the Looney residence along a "direct" route between the two points and without stopping elsewhere.  In order for officers to have known whether Green "drove directly" to the parking lot, Green must have been under constant surveillance the entire time.  Yet, Defendant was able to prove at the *Franks* hearing that Green was not under constant surveillance as he drove from the Looney residence to the parking lot since Officer Dilbeck admitted on cross-examination that he and the other officers had decided not to follow Green in order to avoid compromising their investigation.

Although it is true that the courts should avoid second-guessing investigatory tactics or meddling with police work, there are instances when the courts must determine a simple matter of fact which, unfortunately, might be characterized as second-guessing.  Here, the Court must determine under *Franks* whether the Defendant proved by a preponderance of the evidence that

_____

[8]Merriam-Webster Online Dictionary, http://www.m-w.com/ (last visited Oct. 15, 2005) (defining "directly").

Officer Dilbeck's statement that officers saw Green "drive directly to the... parking lot" is false or misleading. Gov.'t Ex. 3. Based on Officer Dilbeck's own testimony at the September 28 hearing, the Court finds that Defendant has proved by a preponderance of the evidence that the allegation is false and misleading. Although Officer Dilbeck testified that officers saw Green drive away from the Looney residence in the direction of the parking lot, he also admitted that Green was not under constant surveillance as the phrase implies. No officer saw Green "drive directly" to the parking lot. Moreover, even if the Court were to read the phrase "drive directly" as suggesting that WFPD officers saw Ernest Green drive "directly" *away* from the house in the direction of the parking lot, the phrase still is misleading since it suggests that Green was under constant surveillance.

### 2.    Officer Dilbeck's State of Mind

Having established that Officer Dilbeck's statement that officers saw Ernest Green "drive directly" to the parking lot was false or misleading, Defendant must now prove by a preponderance of the evidence whether Officer Dilbeck included this allegation in his affidavit either deliberately or with reckless disregard for the truth. As shown below, Defendant fails to make this showing.

At the September 28 hearing, Officer Dilbeck testified that he drafted the affidavit for the search warrant based the information that he received from Agent Cunningham, his eavesdropping on Agent Cunningham's meeting with La Donna Harris and Ernest Green, his visual observations of the encounter, and the reports of other officers who saw Ernest Green presumably retrieve drugs at the *Looney* residence and drive away in the direction of the parking lot. To corroborate Officer Dilbeck's affidavit, the government played the audio recording of Agent Cunningham's August 24 meeting with Harris and Green in open court. The contents of the audio recording were lengthy, full of colorful conversation, and supported Agent Cunningham's version of events. The recorded

10

dialogues of Harris, Agent Cunningham, and Ernest Green support the inference that Ernest Green retrieved drugs from the Looney residence and returned "directly" to the parking lot.   The government even played the audiotape without interruption from the time that Ernest Green left the parking lot and the moment that he returned with the drugs-- a ten to twenty minute period.  Officer Dilbeck testified that this period of time is consistent with the normal travel time between the parking lot and the Looney residence.  Moreover, Officer Dilbeck testified that officers saw Ernest Green drive away from the parking lot in the direction of the Looney residence and depart the Looney residence in the direction of the parking lot. From these observations, Officer Dilbeck testified that he inferred that the source of the methamphetamine was the Looney residence.

Defendant argued at the September 28 hearing that, at the very least, Officer Dilbeck "recklessly" included the misleading phrase "drive directly" in the affidavit.  However, based on Officer Dilbeck's testimony and his forthright and honest demeanor on cross examination, the Court finds that Officer Dilbeck's testimony regarding his intentions is credible and that any error in stating that officers saw Ernest Green "drive directly" to the parking lot was inadvertent and not deliberate or reckless.  The Court finds that Officer Dilbeck's statement that officers saw Green "drive directly" to the parking lot was only a loose inference from what he observed.  Officer Dilbeck received reports that Green was seen visiting the Looney residence and leaving a short time later.  Officer Dilbeck inferred from this and the short duration of Green's trip, which he testified was consistent with a trip to 4319 Greenridge, that Green had driven "directly" to the parking lot from the Looney residence.  If anything, the Court believes that Officer Dilbeck's statement that officers saw Green "drive directly" to the parking lot was a loose misstatement and not a deliberate attempt to deceive a magistrate into issuing a search warrant on less than probable cause.

Accordingly, the Court finds that the Defendant fails to show by a preponderance of the evidence that Officer Dilbeck deliberately or recklessly included the statement in the affidavit.

### C.       The Affidavit Established Probable Cause to Search

Since Defendant fails to prove by a preponderance of the evidence that Officer Dilbeck acted deliberately or with reckless disregard for the truth when he included the misleading allegation into the affidavit, the good faith exception to the exclusionary rule applies and the Court must now determine whether the *entire* affidavit (including the challenged statement) established probable cause to search Defendant's residence. *See United States v. Cavazos*, 288 F.3d at 710.

Under Texas law, a magistrate evaluating an application for a search warrant must decide whether based on the totality of the circumstances set forth in the affidavit there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Ramos v. State*, 934 S.W.2d 358, 362-63 (Tex.Crim.App. 1996); *Illinois v. Gates*, 462 U.S. 213, 238 (1983). In this regard, probable cause is to be determined from the four corners of the affidavit and any reasonable inferences that may be drawn from it. *Cassias v. State*, 719 S.W.2d 585, 587-88 (Tex.Crim.App. 1986). The allegations recited in the affidavit will be sufficient for a search warrant to issue if they justify a conclusion that the object of the search is probably on the premises. *Ramos*, 934 S.W.2d at 363.

The Texas Court of Criminal Appeals has held that a court reviewing the sufficiency of an affidavit for a search warrant should interpret the affidavit in a common sense and realistic manner, recognizing that the magistrate was permitted to draw reasonable inferences from the information contained in the affidavit. *Hankins v. State*, 132 S.W.3d 380 (Tex.Crim.App. 2004). Because probable cause is determined from the 'four corners' of the affidavit alone, a court reviewing the

12

sufficiency of an affidavit for a challenged warrant does not judge credibility when determining whether the affidavit was sufficient for probable cause.   *Burke v. State*, 27 S.W.3d 651, 654 (Tex.App.--Waco 2000, pet. ref'd) (citing *Wynn v. State*, 996 S.W.2d 324, 326-27 (Tex.App.-- Fort Worth 1999, no pet.)).

In *Carrillo v. State*, , 98 S.W.3d 789 (Tex.App.–Amarillo 2003, pet ref'd), the Amarillo court of appeals upheld a search warrant that was issued based on an affidavit which stated that an undercover officer had purchased drugs from an individual who was seen moving between the location of a drug transaction and the defendant's residence, presumably to obtain the contraband for the prospective purchaser.  In relevant part, the affidavit at issue in *Carrillo* stated the following:

> The subject advised Affiant he/she had to travel to another location to receive the cocaine.   This subject left Affiant and drove directly to this residence.   Upon arriving, this subject went inside the residence, and exited a short time later.   The amount of time the subject spent inside the residence was consistent with a narcotics transaction.   The subject then left and drove a short distance to a pay phone, where a call was placed.   After the call, this subject drove directly back to this residence and went inside again.   When he/she arrived the second time, a 1991 Plymouth Van had arrived bearing Texas Registration DB28CX.  After a short time, this subject left this residence and drove directly back to Affiant, where a quantity of cocaine was delivered to Affiant.  This subject was kept under surveillance during this entire time and met with no other subjects.

*Id.*, at 792.  The magistrate approved the warrant, and drugs were discovered during a search of the defendant's home.  *Id.*

On appeal from his conviction, the defendant argued that the statements in the affidavit pertaining to the individual's movements were based on hearsay – e.g. the individual's comment to the undercover affiant that he had to go elsewhere to obtain the drugs – since the affiant had remained at the original location while the individual deliberately left to obtain the drugs.  The court of appeals rejected this argument for lack of evidence suggesting that the affiant could not have been

13

aware of the suspect's movement. *Id.*, at 793. More importantly, the court found that "[e]ven ignoring the subject's hearsay statement, there are only two rational inferences that can be drawn from the subject's actions, namely 1) she went to the house to pick up the cocaine, or 2) she went to the house to make [the affiant] believe that was where she obtained the cocaine." *Id.* Accordingly, the court found that the affidavit was sufficient to establish probable cause to search.

The facts recited in the affidavit at issue in this are similar to those found in *Carrillo* and provide more evidence to find probable cause to search the Looney residence. Here, the affidavit states the following: Agent Cunningham had purchased drugs from Harris on three occasions. On one of those occasions, Defendant's wife accompanied Harris. Harris later identified Defendant's wife as the source of the drugs. On the day of the bust, Harris and Green met with Agent Cunningham and told him that they did not have the drugs since Mary Beth Looney was afraid to sen them. After a lengthy conversation, Ernest Green left the parking lot and drove to the Looney residence. While Harris was inside the residence, La Donna Harris phoned Looney. She then told Agent Cunningham that Mary Beth Looney was sending the drugs with Green. Officers observed Ernest Green arrive at the home, enter, and depart directly to parking lot shortly thereafter. Green then delivered the drugs when he returned to the parking lot.

Based on these recitals in the affidavit, a magistrate could reasonably infer that Defendant's residence contained methamphetamine. Agent Cunningham, a prospective buyer, was given the impression that Green was going somewhere to obtain the drugs for sale, while other police officers observed Green enter and leave the residence while seeking to procure the contraband. Like in *Carrillo*, the magistrate in this case had sufficient evidence from which he could reasonably infer that under the totality of the circumstances Defendant's residence was the likely source of

methamphetamine.  *Cf. Carrillo*, 98 S.W.3d at 793.

Even more incriminating was that Harris indicated that Defendant's residence was the source of the methamphetamine and that Green returned from his trip to the residence with methamphetamine.  In *Brown v. State*, 115 S.W.3d 633 (Tex.App.–Waco 2003, no pet), the Waco court of appeals ruled that an affidavit for a search warrant contained sufficient information to establish probable cause that the defendant was manufacturing methamphetamine at his home.  The affidavit indicated that the defendant had purchased chemicals used in the manufacturing process, that an individual at the defendant's former residence indicated that she believed that the defendant had been producing methamphetamine, and that methamphetamine had just been seized from a vehicle seen departing from defendant's residence.  The court concluded that these facts, "[t]aken together," provided a "substantial basis" for the magistrate to find probable cause to search the residence for methamphetamine.  *See id.*, at 637.

This Court finds that the facts recited in Officer Dilbeck's affidavit provided a substantial basis for the magistrate to conclude that probable cause to search the Looney residence existed since those recitals, taken together, established probable cause to search Defendant's residence.

## CONCLUSION

The Court finds that Officer Dilbeck and his fellow officers did not deliberately or recklessly include a false or misleading statement in the affidavit and that the affidavit established probable cause to search Defendant's residence.

15

Accordingly, Defendant's motion to suppress is **DENIED**.

It is so **ORDERED.**

**ENTERED:   October 18, 2005.**

_____

**JUDGE JERRY BUCHMEYER**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

16